EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** § <br> § <br> **Plaintiff,** § <br> § <br> **v.** § <br> § <br> **BRIAN A. BJORK;** § <br> **ESTATE OF JOEL DAVID SALINAS;** § <br> **J. DAVID GROUP OF COMPANIES, INC.** § <br> **J. DAVID FINANCIAL GROUP, L.P.;** § <br> **SELECT ASSET MANAGEMENT, LLC;** § <br> **SELECT CAPITAL MANAGEMENT, LLC** § <br> **SELECT ASSET FUND I, LLC; and** § <br> **SELECT ASSET PRIME INDEX FUND, LLC,** § <br> § <br> **Defendants.** § <br> § | § **Civil Action No.: 11-cv-2830** <br> § **ECF** |

**FIRST AMENDED COMPLAINT**

Plaintiff Securities and Exchange Commission ("Commission") alleges as follows against Defendant Brian A. Bjork; Defendant J. David Group of Companies, Inc. ("J. David Group"); Defendant J. David Financial Group LP ("J. David Financial"); Defendant Select Asset Management, LLC ("Select Asset"); Defendant Select Capital Management, LLC ("Select Capital"); Defendant Select Asset Fund I, LLC ("Fund I"); Defendant Select Asset Prime Index Fund, LLC ("Fund II"); and Defendant Estate of Joel David Salinas ("Salinas Estate"):

**SUMMARY**

1.      From at least 2004 through the present, Defendant Bjork offered securities in two fraudulent securities schemes, raising approximately $52 million combined. In the first scheme, which defrauded more than 100 investors of approximately $39 million, Bjork offered investors corporate bonds through Defendants J. David Group and J. David Financial. Bjork offered the

bonds alongside his business associate, Joel David Salinas, who founded J. David Group and served as its president until his death, apparently by suicide, on July 17, 2011. Bjork and Salinas promised investors safe, fixed income by investing in highly rated corporate and other bonds with annual yields up to 9%. In reality, the J. David Group corporate bond offering was bogus. Through his company, Defendant, Select Asset, Bjork provided investors account statements reflecting investments in bonds that, in truth, did not exist or that neither J. David Group nor J. David Financial ever acquired as promised.

2.  In the second scheme, Bjork—through Defendant Select Asset and its subsidiary, Defendant Select Capital—offered securities issued by two private funds, Defendants Fund I and Fund II, raising approximately $13 million from at least 52 investors since August 2007. Defendant Select Capital served as the fund manager of both Fund I and Fund II. Bjork controlled Defendant Select Asset, serving as its CEO, and also controlled Defendant Select Capital, serving as one of its three "Principals" named in Fund I and Fund II private-placement memorandums ("PPMs"), which Bjork disseminated to investors.

3.  In addition to comingling investor money and failing to get financial-statement audits promised in the PPMs, each Fund transferred money to Fund-affiliated entities in related-party transactions undisclosed to investors. For example, less than a month after an investor deposited $1 million in Fund II in March 2010, Select Asset took $1 million from Fund II in exchange for an illiquid investment that Select Asset had acquired for the same amount in 2006. Similarly, in December 2010, Select Asset and Select Capital caused Fund II to transfer a $400,000 investor deposit to Defendant J. David Group as a purported loan. The Defendant Funds engaged in these and similar transactions, disregarding required due-diligence and loan-approval procedures set forth in the PPMs. In total, the Funds used approximately $3.4 million

of the approximately $13 million raised—approximately 26%—for undisclosed affiliated transactions.

4. By engaging in the conduct described above, the Defendants participated in fraudulent schemes involving the offer and sale of securities and have violated, and, unless enjoined, will likely continue to violate, anti-fraud provisions of the federal securities laws, as follows:

 a. Bjork and Select Asset violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Sections 206(1) and 206(2) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-6(1) and (2)]; aided and abetted other Defendants' violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Section 10(b) of the Exchange Act and Rule 10b-5 [15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5];  and, as a control person of other Defendants under Section 20(a) of the Exchange Act[15 U.S.C. § 78t(a)], are jointly and severally liable for the violations of Section 10(b) of the Exchange Act and Rule 10b-5 [15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5] committed by other Defendants.

 b. J. David Group and J. David Financial violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Section 10(b) of the Exchange Act and Rule 10b-5 [15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5].

 c. Select Capital violated Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and (2)]; aided and abetted other Defendants' violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and  Section 10(b) of the Exchange Act

and Rule 10b-5 [15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5] ; and, as a control person of other Defendants under Section 20(a) of the Exchange Act, is jointly and severally liable for the violations of Section 10(b) of the Exchange Act and Rule 10b-5 [15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5] committed by those other Defendants.

        d.      Fund I and Fund II violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Section 10(b) of the Exchange Act and Rule 10b-5 [15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5].

## JURISDICTION AND VENUE

5.      The investments offered and sold by Defendants are "securities" under Section 2(1) of the Securities Act [15 U.S.C. § 77b(1)] and Section 3(a)(10) of the Exchange Act [15 U.S.C. § 78c(a)(10)].

6.      The Commission brings this action under the authority conferred upon it by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)], Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)], and Section 209(d) of the Advisers Act [15 U.S.C. § 80b-9(d)] to enjoin Defendants temporarily, preliminarily, and permanently from future violations of the federal securities laws.

7.      This Court has jurisdiction over this action, and venue is proper, under Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], Section 27 of the Exchange Act [15 U.S.C. § 78aa], and Section 214 of the Advisers Act [15 U.S.C. § 80b-14].

8.      The Defendants have, directly or indirectly, made use of the means or instruments of transportation and communication, and the means or instrumentalities of interstate commerce, or of the mails, in connection with the transactions, acts, practices, and courses of business

alleged herein.  Certain of the transactions, acts, practices, and courses of business occurred in the Southern District of Texas.

## STATEMENT OF FACTS

**Defendants**

9. **Defendant Bjork**, 42, resides in Missouri City, Texas, is the CEO, managing member, chief investment officer, and chief compliance officer of Defendant Select Asset.  Until July 2011, Bjork also served as a senior vice president of J. David Group.

10. **Defendant J. David Group** is a Texas corporation formed in 1987 and headquartered in Friendswood, Texas.  J. David Group served as an umbrella organization for several interconnected insurance and financial-services companies under the common control of J. David Salinas (deceased), who served as its president, and Defendant Bjork, who served as its senior vice president.  These companies included Defendant J. David Financial; Defendant Select Asset; Defendant Select Capital; Defendant Fund I; and Defendant Fund II.

11. **Defendant Salinas Estate** is composed of the property in which Salinas had an interest at the time of his death, including real, personal, or other property he owned, possessed, or controlled, whether directly or indirectly.

12. **Defendant Select Asset** is a Texas limited liability company formed in February 2006 and headquartered in Houston, Texas.  Select Asset became registered with the Commission as an investment adviser effective September 2, 2010, and has been registered as an investment adviser with the State of Texas since July 23, 2008.  Until March 2011, Select Asset was majority owned by the Salinas Trust.  Defendant Bjork is Select Asset's managing member, CEO, chief investment officer, and chief compliance officer.

13.     **Defendant J. David Financial** was formed in 2004 by Salinas, Bjork, Richardson, and the J. David Salinas Family Trust ("Salinas Trust") an entity Salinas controlled. Despite the "L.P." in its name, J. David Financial has never filed a chartering document to become a limited partnership under the laws of any state. Its initial partners were Salinas, Bjork, Richardson, and the Salinas Trust. J. David Financial has never been registered with the Commission in any capacity, nor has it ever registered any offering of securities with the Commission.

14.     **Defendant Select Capital**, a Texas limited liability company formed in 2006, is a wholly-owned subsidiary of Select Asset with offices in Houston, Texas, and Rock Island, Illinois. Select Capital serves as the fund manager to Fund I and Fund II, both private investment funds offered to investors through Select Asset. Bjork served as one of Select Capital's three "Principals."

15.     **Defendant Fund I** is a Delaware limited liability company formed in April 2007 to provide investors with an alternative fixed-income investment opportunity. Fund I has never registered a securities offering with the Commission. Fund I has never registered with the Commission as an investment company. Unregistered investment funds such as Fund I and its sister Fund II are commonly referred to as "hedge funds." Bjork served on Fund I's investment committee.

16.     **Defendant Fund II** is a Delaware limited liability company formed in February 2009 to provide investors with an alternative fixed-income investment opportunity. Fund I has never registered a securities offering with the Commission. Fund I has never registered with the Commission as an investment company. Bjork served on Fund II's investment committee.

**Related Parties**

17. **Joel David Salinas**, deceased, was a resident of Friendswood, Texas and the president and a director or J. David Group. Also, Salinas's family, through a family trust, owned a majority interest in Defendant Select Asset.

18. **Selected Market Insurance Group, LLC** ("Selected Market"), is a Texas limited liability company formed in January 2008 and dually headquartered in Orange Park, Florida, and Friendswood, Texas.

19. **Online Insurance Services, Inc.** ("Online Insurance"), is a Florida corporation formed in 2003 and currently is a wholly-owned subsidiary of Selected Market.

**The Fake-Bond Offering**

20. As early as the 1990s, Salinas purported to acquire highly rated corporate bonds through his company Defendant J. David Group, an insurance and financial-services company he operated. Salinas in turn offered and sold the bonds to J. David Group's investor clients. Defendant Bjork joined J. David Group as an employee in or about 1995, ultimately becoming the company's senior vice president. In or about 2004, J. David Group began to provide financial services to clients, including the bond offering, through Defendant J. David Financial, a J. David Group affiliate controlled by Salinas and Bjork. At J. David Financial, Bjork held the titles "Managing Partner" and "Chief Investment Officer."

21. Beginning in at least 2004, Bjork offered and sold investors corporate bonds, purportedly acquired for them through, and held for them on account at, J. David Financial. For example, in the first half of 2004, Bjork became the account executive for a new J. David Financial account opened by investor Kevin Maley. Maley deposited $225,000 into the account and instructed Bjork to choose suitable investments for him. Bjork purported to invest $150,000

of Maley's initial investment into corporate bonds issued by IBM and Ford and held on account for Maley at J. David Financial.  From 2004 through December 2006, Bjork purported to acquire additional corporate bonds for Maley through J. David Financial at a cost of approximately $400,000.

22. From the bond offering's early years through December 2006, J. David Financial issued bond investors monthly account statements purporting to reflect their bond holdings.  For each investor, the statement showed that the investor held corporate or other bonds in a numbered account at J. David Financial.  The statement further showed the investor's basis in each bond held in the account and also showed the bond's market value.

**The Fake-Bond Offering Continued through Defendant Select Asset**

23. In or about 2006, Bjork and Salinas formed yet another company, Defendant Select Asset, to become a financial-services provider under the J. David Group umbrella.  On January 1, 2007, J. David Financial transferred most, if not all, of its investor accounts to Select Asset, where Bjork served as CEO and chief investment officer.  At Select Asset, Bjork continued to offer investors corporate bonds as he had done at J. David Financial.  For example, in early 2007, Bjork sold investor Joe Kuhn a "safe," "highly rated corporate bond" for $200,000.  Only now, Bjork offered the J. David Financial bonds through Select Asset.

24. In January 2007, Select Asset began issuing monthly account statements to the bond investors who previously held accounts at J. David Financial.  The Select Asset account statements were virtually identical to those previously issued by J. David Financial, including a reference to Bjork as the person responsible for the account.  The January 2007 statements carried over the bond-holdings and other information from investors' December 2006 J. David Financial statements.  In the bond section, however, under the heading "Account Type," all the

new statements listed "J. David Financial Group," suggesting that, after the transition on January 1, 2007, J. David Financial retained actual custody of the investors' bonds.

25. In reality, J. David Group did not retain actual custody of the bonds. Indeed, neither Salinas nor Bjork, through J. David Group, J. David Financial, Select Asset, or otherwise, had ever actually acquired the bonds reflected in the account statements. The bond offering was a sham. As of June 30, 2011, Salinas and Bjork had swindled more than 100 investors out of more $39 million through the fraudulent bond offering.

### Bjork Lied to Investors When Confronted about the Bonds

26. Knowing the bonds were fake, Bjork reassured concerned investors that their J. David Financial bonds were an appropriate part of their investment portfolios. For example, in late 2009 or early 2010, Maley tried to use the bonds Bjork sold him as collateral for a business loan from a bank. After the bank raised concerns about the legitimacy of the bonds listed on Maley's Select Asset statement, Maley obtained CUSIP numbers for the bonds from Select Asset and provided the CUSIP numbers to the bank.

27. Bank personnel informed Maley that they found a number of discrepancies between the bonds listed in his Select Asset statements and actual bonds, including errors in the bond descriptions and market value. Maley met with Bjork to clear up the discrepancies. Bjork told Maley that Salinas bought the bonds in bulk and distributed them among his clients, providing them a return higher than market rates, and that J. David Financial kept track of who actually owned the bonds. He also told Maley that there had been an audit and that he need not worry. These statements were false. Salinas did not buy bonds in bulk. And because the bonds were fake, Bjork had obviously never verified, by third-party confirmation or otherwise, that

Salinas purchased bonds in bulk. Likewise, the J. David Financial bond offering had never been audited. And Bjork had obviously never verified that any bond-offering audit had taken place.

28. Similarly, in November 2010, an elderly investor's grandson met with Bjork, challenging him about the market values for the bonds on his grandmother's Select Asset account statement. The grandson, who had some finance experience, pressed Bjork that the high bond values appeared to good to be true. Bjork assured the grandson that the values were correct and that Bjork knew how the values were determined, conveying the false impression that Bjork had actually purchased the bonds.

### Bjork Concealed the Fake Bond from Examiners

29. In January 2011, Bjork lied to examiners from the Commission's Fort Worth Office, concealing the scheme's existence. Examiners met with Bjork in his Houston office during a compliance examination of Bjork's brokerage and investment-advisory activities at Select Asset. At the time, the examiners knew nothing about the bond offering and were therefore not intentionally seeking information about it. In response to the examiners' questions, Bjork told the examiners that Select Asset clients only received a statement from the broker holding the advised assets and did not receive a separate statement from Select Asset. Bjork concealed the existence of the Select Asset account statements, preventing the examiners from discovering the fictitious bond holdings at J. David Financial.

### The Fraudulent Select Asset Private Fund Offerings: Fund I and Fund II

30. In the second scheme, Bjork—through Defendant Select Asset and its subsidiary, Defendant Select Capital—offered securities in the form of units of preferred limited liability company membership interests ("Units") issued by two private funds, Defendants Fund I and Fund II. Defendant Select Capital served as the fund manager of both Fund I and Fund II. Both

Select Asset and Select Capital were investment advisers who owed fiduciary duties to Fund I and Fund II as clients.  As mentioned above, Bjork controlled Defendant Select Asset, serving as its CEO, and also controlled Defendant Select Capital, serving as one of its three "Principals" named in Fund I and Fund II offering documents, specifically the PPMs.  As stated in the PPMs, he also served on a five-member investment committee responsible for reviewing and approving the investments the Funds would make.

31. The Fund I and Fund II PPMs said the Funds intended to build a commercial-loan portfolio by originating short-term commercial loans, purchasing loan participations and syndications, and investing in commercial-loan funds.  Each PPM also said the Fund manager would seek loan opportunities with relatively short durations, focusing on asset classes that either pay in full or re-price in six to 36 months.

32. Although the Fund I and Fund II PPMs directed investors to send their subscription documents to Select Capital's office in Rock Island, Illinois, Select Capital did not maintain its own bank accounts.  Instead, investor funds were deposited into bank accounts maintained and controlled by Select Asset, Fund I, or Fund II in Houston.

33. The Fund I offering, which began in August 2007, raised at least $8.6 million from 28 investors.  The Fund II offering, which began in September 2009, raised approximately $5.3 million from 24 investors from September 2009 through December 2010.  Through Select Asset and Select Capital, Bjork offered and sold the Fund I and Fund II offerings investors, including clients of Select Asset and J. David Financial.  In the offering process, Bjork provided investors information about the offerings orally and in writing and by giving them the PPMs.

### Undisclosed Related-Party Transactions

34.     The Fund I and Fund II PPMs did not disclose that investor money would be used to make loans to or from affiliates.  But both Funds loaned money to affiliates.  First, in November and December 2007, just two months after its initial receipt of funds, Fund I loaned $300,000 to Online Insurance.  Soon thereafter, Selected Market—a Fund I affiliate owned 51% by Salinas, whose family trust owned a majority of Select Asset—acquired Online Insurance.  In March 2008, Fund I began loaning money to Selected Market, ultimately transferring $2 million to that entity.  Second, Fund II loaned approximately $800,000 to Selected Market in late 2009 and early 2010.  Third, Fund II loaned J. David Group $400,000 on December 27, 2010, just days after receiving a $400,000 investment from a Fund II investor.

35.     Fund II also engaged in a major undisclosed transaction directly with Select Asset.  In March 2010, an investor deposited $1 million in Fund II.  Less than a month later, Select Asset transferred $1 million from Fund II to Select Asset.  In exchange for the $1 million, Select Asset gave Fund II shares of the Global Leveraged Capital Credit Opportunity Fund I ("GLC Fund"), which Select Asset had purchased in 2006 for $1 million.  Although Fund II's PPM said it would focus on short-term loans of six to 36 months, the GLC Fund shares were highly illiquid.  The GLC Fund has no obligation to redeem the shares until December 2018.

36.     In undisclosed, related-party transactions, Select Asset and Select Capital also comingled the investor funds raised in Fund I and Fund II.  Almost all of the nearly $2.1 million Fund II raised in late 2009 and early 2010 was initially deposited in Fund I's bank account.  In early 2010, Fund I transferred $970,000 to Fund II, but retained approximately $330,000 of Fund II's money.  Moreover, in January 2010, Fund I purportedly opened a $2 million line of credit from Fund II.

37. Fund I and Fund II made the foregoing undisclosed affiliate loans, comingling transactions, and related-party transactions without complying with the due-diligence and investment-committee approval process described in their respective PPMs. Moreover, the PPMs provided to investors after those transactions did not include updated information describing those transactions or the inherent conflicts of interest they presented.

### Fund I and Fund II Failed to Have Promised Audits

38. The Fund I and Fund II limited liability company agreements, attached as exhibits to their respective PPMs, provided that annual audited financial statements and quarterly unaudited balance sheets would be given to investors. Neither Fund's financial statements, however, has ever been audited. And Bjork admitted to Commission examiners that Select Asset and Select Capital have never provided the investors even the unaudited quarterly balance sheets for the Funds. The Funds, however, failed to disclose in the PPMs provided to later investors that the earlier investors had not been given the promised financial information.

### FIRST CLAIM

### Violations of Section 17(a) of the Securities Act
### [15 U.S.C. § 77q(a)]

39. Plaintiff Commission re-alleges and incorporates paragraphs 1 through 38 of this Complaint by reference as if set forth *verbatim*.

40. Defendants Bjork, Select Asset, J. David Group, J. David Financial, Fund I and Fund II, directly or indirectly, singly or in concert with others, in the offer or sale of securities, by use of the means and instrumentalities of interstate commerce and by use of the mails have: (a) employed devices, schemes, and artifices to defraud; (b) obtained money or property by means of untrue statements of a material fact and omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made,

not misleading; and (c) engaged in transactions, practices, and courses of business which operate or would operate as a fraud and deceit upon the purchasers.

41. As a part of and in furtherance of their scheme, the Defendants Bjork, Select Asset, J. David Group, J. David Financial, Fund I and Fund II, directly and indirectly, prepared, disseminated, or used contracts, written offering documents, promotional materials, investor and other correspondence, and oral presentations, which contained untrue statements of material facts and misrepresentations of material facts, and which omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, including, but not limited to, those set forth in Paragraphs 1 through 13, above.

42. With respect to violations of Sections 17(a)(2) and (3) of the Securities Act, Defendants Bjork, Select Asset, J. David Group, J. David Financial, Fund I and Fund II were negligent in their actions regarding the representations and omissions alleged herein. With respect to violations of Section 17(a)(1) of the Securities Act, the Defendants Bjork, Select Asset, J. David Group, J. David Financial, Fund I and Fund II made the above-referenced misrepresentations and omissions knowingly or with severe recklessness regarding the truth.

43. By reason of the foregoing, Defendants Bjork, Select Asset, J. David Group, J. David Financial, Fund I and Fund II have violated and, unless enjoined, will continue to violate Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## SECOND CLAIM

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5**
**[15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5]**

44. Plaintiff Commission re-alleges and incorporates paragraphs 1 through 38 of this Complaint by reference as if set forth *verbatim*.

45. Defendants Bjork, Select Asset, J. David Group, J. David Financial, Fund I and Fund II, directly or indirectly, singly or in concert with others, in connection with the purchase or sale of securities, by use of the means and instrumentalities of interstate commerce and by use of the mails have:  (a) employed devices, schemes, and artifices to defraud;  (b) made untrue statements of a material fact and omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c)  engaged in acts, practices, and courses of business which operate or would operate as a fraud and deceit upon purchasers, prospective purchasers, and any other persons.

46. As a part of and in furtherance of their scheme, Defendants Bjork, Select Asset, J. David Group, J. David Financial, Fund I and Fund II, directly and indirectly, prepared, disseminated, or used contracts, written offering documents, promotional materials, investor and other correspondence, and oral presentations, which contained untrue statements of material facts and misrepresentations of material facts, and which omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, including, but not limited to, those set forth in Paragraphs 1 through 38 above.

47. Defendants Bjork, Select Asset, J. David Group, J. David Financial, Fund I and Fund II made the above-referenced misrepresentations and omissions knowingly or with severe recklessness regarding the truth.

48. By reason of the foregoing, Defendants Bjork, Select Asset, J. David Group, J. David Financial, Fund I and Fund II violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5  [17 C.F.R. § 240.10b-5].

## THIRD CLAIM

### Violations of Section 206(1) and 206(2) of the Advisers Act
### [15 U.S.C. §§ 80b-6(1) and (2)]

49. The Commission repeats and incorporates paragraphs 1 through 38 above by reference as if set forth verbatim.

50. Defendants Bjork, Select Asset, and Select Capital, investment advisers, directly or indirectly, singly or in concert with others, by use of the means or instruments of transportation or communication in interstate commerce, or of the mails (a) have employed devices, schemes, or artifices to defraud clients and prospective clients and (b) have engaged in transactions, practices, or courses of business which operate as fraud or deceit upon these investors.

51. Defendants Bjork, Select Asset, and Select Capital knew or were reckless in not knowing that the representations and omissions set forth in paragraphs 1 through 38 were false and misleading.

52. By reason of the activities described above, Defendants Bjork, Select Asset, and Select Capital violated and, unless enjoined, will continue to violate Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and (2)].

## FOURTH CLAIM

### Aiding and Abetting
### Violations of Section 17(a) of the Securities Act
### [15 U.S.C. § 77q(a)]

53. Plaintiff Commission re-alleges and incorporates paragraphs 1 through 48 of this Complaint by reference as if set forth *verbatim*.

54. Defendants Bjork, Select Asset, and Select Capital knowingly or recklessly gave substantial assistance to Defendants Fund I and Fund II in the Funds' violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]

55. By reason of the foregoing, Defendants Bjork, Select Asset, and Select Capital aided and abetted violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## FIFTH CLAIM

### Aiding and Abetting
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### [15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5]

56. Plaintiff Commission re-alleges and incorporates paragraphs 1 through 48 of this Complaint by reference as if set forth *verbatim*.

57. Defendants Bjork, Select Asset, and Select Capital knowingly or recklessly gave substantial assistance to Defendants Fund I and Fund II in the Funds' violations of Section 10(b) of the Exchange Act and Rule 10b-5 [15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5].

58. By reason of the foregoing, Defendants Bjork, Select Asset, and Select Capital aided and abetted violations of Section 10(b) of the Exchange Act and Rule 10b-5 [15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5].

## SIXTH CLAIM

### Controlling-Person Liability for
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### [15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5]

1. Plaintiff Commission re-alleges and incorporates paragraphs 1 through 48 of this Complaint by reference as if set forth *verbatim*.

2. Defendants Bjork, Select Asset, and Select Capital, directly or indirectly, controlled Fund I and Fund II when the Funds violated Section 10(b) of the Exchange Act and Rule 10b-5 [15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5].

3. Defendants Bjork, Select Asset, and Select Capital participated in the Fund I and Fund II misconduct that violated Section 10(b) of the Exchange Act and Rule 10b-5 [15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5].

4. By reason of the foregoing, Defendants Bjork, Select Asset, and Select Capital are jointly and severally liable under Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)] for the Fund I and Fund II violations of Section 10(b) of the Exchange Act and Rule 10b-5 [15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5].

## **RELIEF REQUESTED**

**WHEREFORE**, Plaintiff respectfully requests that this Court:

### I.

Temporarily, preliminarily, and permanently enjoin the Defendants from violating the federal securities laws described in the above six claims.

### II.

Order the Defendants to disgorge an amount equal to the funds and benefits they obtained illegally, or to which they do not have a legitimate claim or entitlement, as a result of the violations alleged, plus prejudgment interest on that amount.

### III.

Order the Defendants, except Fund I and Fund II, to pay civil monetary penalties in an amount determined as appropriate by the Court pursuant to Section 20(d) of the Securities Act

[15 U.S.C. § 77t(d)], Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)], and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)] for their violations alleged herein.

## IV.

Order such further relief as this Court may deem just and proper.

Dated:  November 16, 2017            Respectfully submitted,

**s/Timothy S. McCole**
TIMOTHY S. MCCOLE
Mississippi Bar No. 10628
SDTX Bar No. 899792
United States Securities and Exchange Commission
Burnett Plaza, Suite 1900
801 Cherry Street, Unit 18
Fort Worth, Texas 76102
Telephone: (817) 978-3821
Fax: (817) 978-4927
E-mail: McColeT@SEC.gov
Attorney in Charge for Plaintiff Securities and
  Exchange Commission